FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:

                                                     Case No. 808-75371-reg

JILL SUSAN MENDELSON
a/k/a JILL SUSAN ROMAINE-MENDELSON,

                                                     Chapter 13

                                Debtor.
----------------------------------------------------------------x

## <u>MEMORANDUM DECISION</u>

      Before the Court is an objection by the Chapter 13 Trustee to confirmation of the

Debtor's Chapter 13 plan.  The Trustee argues, under 11 U.S.C. §1325(b)(1)(B), that the

Debtor's proposed Chapter 13 plan does not commit all of the Debtor's "projected disposable

income" toward repayment of unsecured creditors.  The Trustee's argument is two-fold.  First, he

argues that the Debtor is improperly taking a secured debt expense deduction on Form B22C for

repayment of a car loan installment contract.  The vehicle is owned jointly by the Debtor and her

ex-husband, however, the payments are made solely by the ex-husband.  Second, the Trustee

argues that the Debtor has not included all of her "current monthly income" on Form B22C

because her bank statements show significant deposits in excess of that which the Debtor

reported, including funds she voluntarily withdrew from her qualified retirement savings account.

For the reasons that follow, the Trustee's objection is sustained, in part, and overruled, in part.


### *Background*

      The Debtor filed a Chapter 13 petition on September 29, 2008.  Schedule I to the petition

lists $5,689.26 in net take home pay, and Schedule J lists $5,384.63 in average monthly

expenses, leaving $304.63 in net monthly income.  The Schedule J expenses include car loan installment payments of $140 for an unspecified vehicle, and $0 installment payments for a 2003 Chevrolet Equinox with a notation that the expense is "paid by ex-husband."  On November 11, 2008, the Debtor filed an Amended Chapter 13 plan which proposes to pay $325 per month for 60 months - a total of $19,500.  Along with the Amended Chapter 13 plan, the Debtor filed an Amended Form B22C.  The net result of the Debtor's calculations on Form B22C is that the Debtor has monthly disposable income of $294.86 under 11 U.S.C. §1325(b)(2).  In reaching this figure, the Debtor took the IRS standard vehicle ownership expense on Lines 28 and 29, and secured debt repayment expenses on Line 47, for two vehicles: (1) a 2005 Chevrolet Equinox ("Equinox")[1], and (2) a 2007 Honda Element.  This resulted in a total secured debt expense deduction of $489 for each vehicle.[2]

At the confirmation hearing on January 8, 2009, the Trustee asserted oral objections to confirmation under Section 1325(b).[3]  First, the Trustee argues that the Debtor should not be

---

[1]

The Court will assume that there is only one Chevrolet Equinox at issue, whether it is a 2003 or 2005.  Also, although the Debtor's petition indicates that the Equinox was leased, and there was some discussion on the record of the January 8, 2009 hearing indicating that the Equinox was leased, it appears that the car was the subject of a retail installment contract between the Debtor, Jeffrey D. Mendelson (her ex-husband) and Dobler Chevrolet.  GMAC, LLC, as assignee of Dobler Chevrolet, filed a motion on December 8, 2008, seeking relief from the automatic stay in order to enforce its rights as against the Equinox as a result of the Debtor and her ex-husband's failure to make the car loan payments.  The motion attaches a copy of a retail installment contract which is evidence that the Equinox was not leased.

[2]

While the Debtor only included an actual average monthly payment expense of $33.90 for the Equinox, as an above-median debtor she is permitted to take the IRS standard deduction of $489. *See* 11 U.S.C. § 1325(b)(3).

[3]

The January 8th hearing date was the return date on a motion to dismiss by the Trustee.  On December 18, 2008, the Trustee had filed a motion to dismiss alleging that the Debtor "failed to

permitted to take a vehicle ownership expense for the Equinox because, although the Debtor and her ex-husband own the vehicle jointly and are both obligated on the contract, the vehicle is being used exclusively by the ex-husband and he alone makes the monthly loan payments on that car. The Debtor, he argues, should not be permitted to take an expense for a payment that she does not make even if she is contractually obligated to do so. Concomitantly, the Trustee asserts that if the Debtor is permitted to deduct the ownership expense for the Equinox, she should be required to include the ex-husband's contributions on the income side of Form B22C. The Trustee argues that since the payments made by the ex-husband are for the Debtor's benefit they must be included in "current monthly income" under 11 U.S.C. §101(10A).

Second, the Trustee objects to confirmation on the basis that the Debtor has not committed all of her "current monthly income" toward repayment of unsecured creditors. Specifically, the Trustee argues that the Debtor's bank statements show deposits significantly in excess of the income she reported on both Schedule I and Form B22C. The Trustee's calculation of the Debtor's average "current monthly income" based on bank deposits in the six months prior to the filing of the petition, is $18,437.61. In contrast, on Form B22C, the Debtor reported average current monthly income of $10,031 for the six month period prior to bankruptcy. There is, therefore, an $8,406.61 discrepancy between average current monthly income reflected in bank deposits and average current monthly income reported on Form B22C.

According to a statement filed by the Debtor's counsel on February 11, 2009, the excess

---

provide the Trustee with an affidavit of contribution including pay stubs attached from ex-husband; an amended means test to list tax refund; and bank statements from account 7654 from August 5, 2008 through September 30, 2008." To the extent these allegations are not already resolved or resolved by this Memorandum Decision, the Court will address the Trustee's motion to dismiss at a subsequent hearing.

deposits are attributed to the following:

1.      Withdrawals from the Debtor's Thrift Savings Plan within the 6 months prior to filing
        bankruptcy in the amount of $8,850.34;
2.      Cash advance from the Debtor's mother's bank account in the amount of $17,400;
3.      Repayments to the Debtor on a loan in the amount of $8,150;
4.      A gift to the Debtor from her mother in the amount of $1,950; and
5.      Deposits to the Debtor's bank account which were used to pay expenses for the party who
        gave the Debtor the monies to deposit, in the amount of $1,855.23.

The Trustee's position is that all of these deposits must be considered "income" to the Debtor

under Section 1325(b) and the definition of "current monthly income" under Section 101(10A).

Section 101(10A) states that "current monthly income" includes "income *from all sources* that

the debtor receives [during the 6-month period preceding the bankruptcy] without regard to

whether such income is taxable income . . . " 11 U.S.C. §101(10A) (emphasis added).

        In response, the Debtor argues that the statute permits her to take the secured debt

expense deduction for her ex-husband's car because she is legally obligated on the debt.  In other

words, under Sections 1325(b)(3) and 707(b)(2)(A)(iii), she is permitted to deduct "all amounts

*scheduled as contractually due* to secured creditors in each month of the 60 months following the

date of the petition ..." 11 U.S.C. §707(b)(2)(A)(iii) (emphasis added).  Because she is obligated

on the Equinox installment loan contract and because the payments on the contract are

contractually due for the post-petition period, the Debtor argues that she is permitted to deduct

the expense regardless of whether she actually makes the payment.

        With respect to the "excess income" not reported on Form B22C, the Debtor argues that

distributions from a qualified retirement account such as her Thrift Savings account, should be

excluded from "current monthly income."  In support of this position, the Debtor argues that the

retirement funds were earned and received over a period of years and not within the six months

prior to filing.  The distribution from the retirement account, she argues, is not "income," but

rather is akin to a transfer from the Debtor's savings account to her checking account.

The Debtor has presented no legal arguments in support of excluding as income the other

four categories of deposits into her bank account mentioned above.

### *Discussion*

Resolution of the Trustee's objections to confirmation requires this Court to interpret

Sections 1325(b) and 707(b), and revisit its recent rulings in *In re Almonte*, 397 B.R. 659 (Bankr.

E.D.N.Y. 2008), and *In re Rahman*, No. 808-73335, 2009 WL 205013 (Bankr. E.D.N.Y. Jan. 23,

2009).  Section 1325 of the Bankruptcy Code provides that if the trustee or the holder of an

allowed unsecured claim objects to confirmation, the Court may not approve the plan unless,

. . . as of the effective date of the plan--

(A) the value of the property to be distributed under the plan on account of such
claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's *projected disposable income to be
received in the applicable commitment period* beginning on the date that the first
payment is due under the plan will be applied to make payments to unsecured
creditors under the plan.

11 U.S.C. §1325(b)(1)(B) (emphasis added).

"Projected disposable income" is not a defined term under the Bankruptcy Code.  However, prior

to the October 2005 enactment of the Bankruptcy Abuse Prevention and Consumer Protection

Act of 2005 ("BAPCPA"), a debtor's projected disposable income figures were derived from

actual income and expenses on Schedules I and J.  Pursuant to BAPCPA, "disposable income" is

now defined as:

> *. .. current monthly income* received by the debtor (other than child support
> payments, foster care payments, or disability payments for a dependent child made
> in accordance with applicable nonbankruptcy law to the extent reasonably
> necessary to be expended for such child) less *amounts reasonably necessary to be
> expended*--
>
> (A)(i) *for the maintenance or support of the debtor or a dependent of the debtor*,
> or for a domestic support obligation, that first becomes payable after the date the
> petition is filed; and
>
> (ii) for charitable contributions (that meet the definition of "charitable
> contribution" under section 548(d)(3) [FN1] to a qualified religious or charitable
> entity or organization (as defined in section 548(d)(4)) in an amount not to exceed
> 15 percent of gross income of the debtor for the year in which the contributions
> are made; and
>
> (B) if the debtor is engaged in business, for the payment of expenditures necessary
> for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2) (emphasis added).

The Code provides that for above-median income debtors,[4] as we have in this case, the
"amounts reasonably necessary to be expended for the maintenance or support of the debtor or a
dependent of the debtor" under Section 1325(b)(2), shall be determined in accordance with
Section 707(b)(2)(A) and (B).  Section 707(b)(2)(A)(iii) deals specifically with expense
deductions for secured debt repayments.  Under this subsection, a debtor may take a monthly
deduction for the total amount of payments "scheduled as contractually due" to a secured creditor
within the 60-month period of a debtor's plan, divided by 60.  The wording of the statute is less
than clear and has been the focus of many bankruptcy court opinions.  Section 707(b)(2)(A)(iii),

---

[4] *See* 11 U.S.C. §1325(b)(3) (explaining who qualifies as an above-median income debtor).

provides that:

> The debtor's average monthly payments on account of secured debts shall be calculated as the sum of--
>
> (I) the total of all amounts *scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition*; and
>
> (II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;
>
> divided by 60.
>
> . . .

11 U.S.C. §707(b)(2)(A)(iii) (emphasis added).

The requirements of Section 707(b)(2)(A)(iii)(I) are implemented in practice through Line 47 of Form B22C.

In *In re Almonte*, 397 B.R. 659 (Bankr. E.D.N.Y. 2008), this Court held that a debtor need not include in his "projected disposable income" calculation funds that he received from credit card cash advances in the six months prior to filing bankruptcy.  In so holding, the Court found that the debtor's historic "current monthly income" calculation is but a starting point for determining a debtor's "projected disposable income" under Section 1325(b)(1)(B).  Where actual income reported on Schedules I differs from current monthly income this Court will take into consideration a debtor's actual projected income over the life of the plan.  Specifically, the Court stated that:

> . . .    [I]f the chapter 13 trustee or an unsecured creditor objects to confirmation, the calculation of "disposable income" under Section 1325(b) and Form B22C is but a starting point in reaching the debtor's "projected disposable income."  If a

> debtor's "disposable income" on Form B22C differs from the debtor's actual
> monthly disposable income reported on Schedules I and J, the Court may analyze
> the debtor's actual projected income over the life of the plan in order to avoid a
> result which the Court believes is inconsistent with two fundamental bankruptcy
> principles; that is, giving the honest but unfortunate debtor a "fresh start," and
> requiring a chapter 13 debtor to repay creditors what he can afford from his post-
> petition earnings. . . .
>
> . . . .
>
> If the Court were to include credit card cash advances taken within the six
> months preceding bankruptcy within this Debtor's "projected disposable income,"
> it would commit to the plan funds which the Debtor would not reasonably be
> expected to have during the life of the case.  It would be absurd to assume that the
> Debtor would continue to take cash advances in order to fund his chapter 13 plan,
> and the Court is not prepared to require that result.

*Almonte,* 397 B.R. at 667.  Assuming, without deciding, that cash advances could be considered

income, this Court found that where alleged "income" "would not reasonably be expected" to

recur for a debtor during the life of the case, it should not be included in "projected disposable

income."

On the expense side of the "projected disposable income" analysis, this Court held in

*Rahman,* that a debtor should not be permitted to take a secured debt expense on Form B22C for

mortgage payments on real property where the debtor has stated an intention in his Chapter 13

plan to surrender that real property:

> As in *Almonte*, the Court does not believe the statutes require a finding that
> recognizes "fictional expenses" any more than "fictional income."  As with the
> income side of the disposable income calculation, the Court finds that the expense
> side of the disposable income calculation is forward-looking.  That is to say,
> expense calculations should not be a static evaluation of a debtor's obligations as
> they existed on the petition date. . . . [T]he Court must look at a debtor's stated
> intentions of record as they exist on the date of confirmation to determine what
> expenses are "reasonably necessary to be expended for the maintenance or support
> of the debtor or a dependent of the debtor" during the Chapter 13 plan.  One of the

main requirements in Chapter 13 is that a plan be funded with all of a debtor's disposable income, [and] it would go against the very essence of Chapter 13 to allow a debtor to deduct an expense that he has stated he does not intend to actually pay during the life of the plan. . . . Every dollar of expenses deducted from a debtor's current monthly income is another dollar which is not repaid to unsecured creditors.  Absent binding authority in this Circuit to the contrary, this Court is not prepared to adopt a reading of the statute that permits a debtor to withhold disposable income from repayment to unsecured creditors.

*Rahman*, 2009 WL 205013, at *7.

Both the *Almonte* and *Rahman* decisions applied a forward-looking approach to the "projected disposable income" analysis under Section 1325(b)(1).  As such, in *Rahman* this Court held that in calculating a debtor's "projected disposable income" the Court should take into consideration a debtor's stated intentions as of the petition date and look beyond the petition date to determine a debtor's secured debt expenses:

This approach finds support in certain forward-looking language of both Sections 1325(b) and 707(a).  First, Section 1325(b)(1) requires that a debtor commit all of his "projected" disposable income "to be received" by the debtor towards repayment of unsecured debt.  Use of the words "projected" and "to be received" implies that "projected disposable income" is a forward-looking concept and courts should look at a debtor's disposable income over the life of the plan.  Second, Section 1325(b)(2)'s definition of "disposable income" allows a debtor to deduct expenses for "amounts reasonable necessary *to be expended* for the maintenance or support of the debtor or a dependent of the debtor."  11 U.S.C. §1325(b)(2)(A)(I) (emphasis added).  The use of the words "to be expended" further implies that the calculation of expenses should be forward-looking.  Third, Section 707(b)(2)(A)(iii) refers to amounts "scheduled as contractually due to secured creditors *in each month of the 60 months following the petition date*..." 11 U.S.C. 707(b)(2)(A)(iii) (emphasis added).  Reference to the 60 months "following" the petition date also implies that expenses should be forward-looking.  To the extent that it is not clear that the language of Section 707 is future-oriented, one must remember that Section 707(b) is incorporated into Section 1325(b) by reference and should be read in light of that section.

*Rahman*, 2009 WL 205013, at *6 (footnote omitted).

**1.**    *Secured debt expense deduction*

In this case, the Debtor has taken a secured debt expense deduction for a car which she owns subject to a retail installment contract on which the Debtor is an obligor.  The Debtor freely acknowledges her ex-husband has exclusive use of the car and is solely responsible to make all payments due under the installment contract.  However, it appears that not only is the Debtor not making the car loan payments on the Equinox, but neither is her ex-husband.  On December 8, 2008, GMAC, LLC filed a motion for relief from the automatic stay, and the Section 1301 co-debtor stay, with respect to the Equinox.  The motion alleges that the loan was in default beginning with the October 2008 payment.  The motion was heard on January 5, 2009 and was granted without opposition.

In light of this Court's prior ruling in *Rahman*, this Court finds that the Debtor may not take the secured debt expense deduction for the Equinox.  The Court would be stretching the bounds of reason to find that repayment of a loan on a vehicle driven exclusively by the Debtor's ex-husband is "reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor" under Section 1325(b)(2).  Furthermore, although not stated directly in her proposed Chapter 13 plan, the Debtor's counsel has stated on the record that the Debtor has no intention of making the contractual payments on this obligation.[5]  Consistent with the approach as stated in *Rahman*, this Court does not believe a debtor may take a deduction for

---

[5]

Indeed, the vehicle by now may likely have been repossessed considering that the stay was lifted over two months ago.  Although not central to this holding, it appears that the debt soon will be (or has already been) accelerated and there will no longer be any monthly payment scheduled as contractually due.

repayment of a secured debt where the debtor has clearly stated on the record that she does not intend to make the payments during the pendency of the case.

The court in the case of *In re Quigley*, 391 B.R. 294 (Bankr. N.D. W. Va. 2008), came to the opposite conclusion. In *Quigley*, the debtor was listed as the title owner of the vehicle and both she and her ex-boyfriend were obligated on the note. The debtor's ex-boyfriend had exclusive possession of the vehicle and the debtor did not make payments on the obligation. The chapter 13 trustee objected to the secured payment expense by the debtor arguing that the vehicle was not necessary for the debtor's reorganization because she did not use the vehicle or make payments on the secured obligation. In *Quigley*, the court read Section 707(b)(2)(A)(iii) strictly and found that the debtor could properly take the deduction because she was legally obligated to repay the car loan and the car loan payments were "contractually due" regardless of whether she intended to make the payments. The court applied a "snapshot" approach to Section 707(b)(2)(A) and found dispositive of the issue the fact that on the date of the petition the debtor was contractually obligated to make the payments. However, the court also found that "if the Debtor takes a deduction from her current monthly income for a secured debt that she is contractually required to pay, but for which a non-debtor party is making the payments, then the Debtor must also include the amount of the third party payments in her calculation of current monthly income." *Quigley*, 391 B.R at 316 (relying on Section 101(10A) which includes in "current monthly income" "any amount paid by any entity other than the debtor ... on a regular basis for the household expenses of the debtor....").

The "snapshot" approach applied by the *Quigley* court is directly at odds with the "forward-looking" or "crystal ball" approach which this Court applied in *Almonte* and *Rahman*

and therefore, the Court declines to adopt the holding in *Quigley*. However, it is notable that the result under either approach applying the facts of this case is nearly the same. Although not a dollar-for-dollar exchange, the *Quigley* court required the debtor's secured debt expense to be added back into the income side of the means test.

## 2.    *Distributions from retirement account*

The Trustee also objects to confirmation on the basis that the Debtor has failed to provide for all of her "current monthly income" on Form B22C. The Trustee makes this argument based on his review of the Debtor's bank statements for the six months prior to the petition which show significantly more "income" than reported by the Debtor on the means test. Specifically, the Trustee argues that the Debtor must include distributions from her retirement savings account received within the six-month period prior to the bankruptcy filing, in her disposable income calculations on Form B22C.[6]

Similar facts were presented in the case of *In re DeThample*, 390 B.R. 716 (Bankr. D. Kan. 2008). In *DeThample*, the bankruptcy court held that a singular distribution from a retirement account received within the six-month period prior to bankruptcy should be included within "current monthly income," but should not be included in a debtor's "projected disposable

---

[6]
The facts presented to the Court are that this was an early withdrawal from a retirement account, not a loan. This is based on the Debtor's statement of facts ("Statement"), dated February 11, 2009, which states that "[t]he debtor withdrew $8,850.34 from her Thrift Savings Plan within the six month CMI period." It is also based on the Debtor's tax Form 1099-R attached to the Statement which shows a gross distribution for 2008 of $8,850.34 attributable to an early distribution, as opposed to a loan. The Court notes that both Schedule I and Line 55 of Form B22C list a $1,138.36 expense for repayment of a Prudential retirement account loan. The Court assumes, however, that this is a repayment not attributable to the retirement withdrawals at issue in this decision. If that assumption is not correct this analysis could change substantially.

income" under Section 1325(b)(1).  As this Court held in *Almonte*, the court in *DeThample* held that the "current monthly income" calculation under Section 1325(b)(2) and 101(10A) is but a starting point in the "projected disposable income" analysis.  First, the court found that the retirement account distribution should be included in "current monthly income" because under the definition of that term in Section 101(10A), current monthly income includes "every dime a debtor gets during the relevant period except for those amounts specifically excluded by §101(10A)(B), like Social Security Benefits." *DeThample*, 390 B.R. at 721.  Next, the court focused on the term "projected disposable income" in Section 1325(b)(1) and found that that calculation must take into consideration both the historic figures which flow from the "current monthly income" calculation, *and* a debtor's "future income abilities." *Id.* at 723.  In so holding, the court in *DeThample* adopted the forward-looking approach to "projected disposable income" and relied heavily on the Tenth Circuit Bankruptcy Appellate Panel decision in *In re Lanning*, 380 B.R. 17 (B.A.P. 10th Cir. 2007), which was subsequently affirmed by the Tenth Circuit, *In re Lanning,* 545 F.3d 1269 (10th Cir. 2008), and also *In re Kibbe*, 361 B.R. 302 (B.A.P. 1st Cir. 2007).  In *DeThample*, the debtor had not demonstrated a pattern of making withdrawals from the retirement account and moreover, the retirement account was nearly depleted to the point where future withdrawals would be minimal.  Finally, the court noted that a forward-looking reading of the statute, which excludes from "projected disposable income" retirement account distributions which are not likely to recur post-petition, is consistent with the exemption scheme of Section 522 and Congressional intent to protect retirement assets from the reach of creditors.  The court found:

> [T]he debtors' draw of $4,000 on their 401(k) does not appear to be part of an

ongoing pattern of payments. Indeed, according to debtors' amended Schedule C, only $400 remains in the 401(k) account. This affords sufficient factual predicate to find that a change of circumstances justifies excluding the pre-petition $4,000 401(k) distribution from debtors' CMI, at least for § 1325(b)(1)(B) purposes. While this Court declines to categorically declare that pre-petition 401(k) disbursements may in all cases be excluded from the projected disposable income calculation, where the draw does not appear to have been taken on a planned or periodic basis, it will likely be disregarded in the projected disposable income calculus. This reading is consistent with a reading of other portions of the Code, including the clearly espoused policy of § 522(b)(4) which fully exempts any qualified retirement fund from the bankruptcy estate, § 522(b)(3)(C) that exempts a 401(k) fund for debtors claiming state law exemptions, § 522(d)(12) that exempts any 401(k) fund for debtors claiming federal exemptions, and § 522(n) which allows other Internal Revenue Code 408 funds to be exempted up to $1.0 million. Congress clearly intended that debtors' retirement assets be protected even in the event of debtors' bankruptcy.

*DeThample*, 390 B.R. at 725-26 (footnotes omitted).

Other courts have resolved this same issue by finding that retirement account distributions are not "income" and therefore are not included in "current monthly income" at all. Rather, these courts have found that the income in such situations is realized by the debtor at the time the retirement funds are deposited into the account, not when they are subsequently distributed to the debtor. A distribution from the retirement account under this reasoning, is analogous to a transfer from a debtor's savings account to his checking account. *See Zahn v. Fink (In re Zahn)*, 391 B.R. 840 (B.A.P. 8th Cir. 2008); *Simon v. Zittel*, No. 07-31616, 2008 WL 750346 (Bankr. S.D. Ill. March 19, 2008); *In re Wayman*, 351 B.R. 808 (Bankr. E.D. Tex. 2006).

This Court is persuaded by and adopts the reasoning of the court in *DeThample*. The record in the case before the Court is that the Debtor withdrew $8,850.34 from her retirement account within the six months prior to the petition. There is no indication in the record that there was more than one withdrawal, or, if there was, that the withdrawals were systematic. Nor is

there any indication in the record that the withdrawal(s) are likely to recur post-petition.  As the court noted in *DeThample*, retirement monies are generally exempt from the reach of a debtor's creditors.  Although the Debtor's schedules reflect that there is a significant balance remaining in her retirement accounts and it is possible that the Debtor will make withdrawals post-confirmation, the Court believes it would be inconsistent with its prior decisions and inconsistent with the stated intent of Congress to in essence compel the Debtor to withdraw funds from a qualified retirement account to fund a plan where the Debtor has not stated an intention to do so voluntarily.  In light of these findings, the Court will not compel the Debtor to include voluntary withdrawals from her retirement account in her "projected disposable income" calculation on Form B22C.

### Conclusion

For all of the foregoing reasons, the Court sustains the Trustee's objection to confirmation in part and finds that the Debtor should not be permitted to take a secured debt expense deduction for the Equinox, and overrules the Trustee's objection to confirmation in part and finds that the Debtor need not include withdrawals from her retirement account within "current monthly income."[7]

---

[7] The record has not been fully developed on the other categories of "excess income" referred to in the Debtor's statement of facts, dated February 11, 2009.  As such the Court is not in a position to render a ruling as to whether the "income" reflected in those bank deposits should be included in "current monthly income."

An order consistent with this Memorandum Decision will issue forthwith.

Dated: Central Islip, New York
      March 12, 2009                       ***/s/ Robert E. Grossman***
                                                Robert E. Grossman
                                                United States Bankruptcy Judge